James KOPPIN in his individual official capacity as Lawrence Township Trustee, and the Lawrence Township Fire Department, Appellants–Defendants,

v.

James STRODE and Andrew Richardson, Appellees–Plaintiffs.

No. 49A02–0103–CV–148.

Court of Appeals of Indiana.

Jan. 15, 2002.

Thomas R. Schultz, Donald B. Kite, Sr., Schultz & Pogue, LLP, Carmel, IN, Attorneys for Township.

Brenda Franklin Rodeheffer, Monday Rodeheffer Jones & Albright, Indianapolis, IN, Attorney for Employees.

Anthony W. Overholt, Peggy D. Dallmann, Office of Corporation Counsel for the City of Indianapolis, Indianapolis, IN, Attorneys for Amicus Curiae Louis A. Dezelan, Chief of the Indianapolis Fire Department.

## OPINION

KIRSCH, Judge.

Appellants-defendants James Koppin ("Koppin"), in his official capacity as Lawrence Township Trustee, and the Lawrence Township Fire Department ("the LTFD") (collectively, "Township") appeal the trial court's grant of summary judgment in favor of Appellees-plaintiffs James Strode ("Strode") and Andrew Richardson ("Richardson") (collectively, "Employees").

We reverse.

## ISSUE

Ind.Code § 10-2-4-3 provides that employees of the State of Indiana and of any county, township, municipality, or school corporation in Indiana who are members of the Indiana National Guard or a reserve component, or are retired personnel of the naval, air, or ground forces of the United States are entitled to a leave of absence

without loss of pay or vacation benefits for military service not to exceed fifteen days in any calendar year. Does a township policy providing military leave time of fifteen work days per year and which defines work day as an eight hour period of regularly scheduled duty contravene this section when applied to firefighters whose duty is scheduled in twenty-four hour shifts?

### FACTS AND PROCEDURAL HISTORY [1]

Employees are firefighters employed by the LTFD in Marion County, Indiana. Strode is an active member of the United States Air Force Reserves, and Richardson is an active member of the Kentucky National Guard; both are Marion County residents. As members of their respective units, Employees are required to spend one weekend per month and an additional two weeks per year in training with the Indiana Reserve. They can be called into active duty at any time in case of emergency or military need. As of December 1998, Employees worked a schedule of twenty-four hours on duty, followed by forty-eight hours off duty.[2]

As of December 1998, Ind.Code § 10–2–4–3 read as follows:

(a) This section applies to all officers and employees [3] of the state of Indiana or any county, township, municipality, or school corporation in Indiana who are listed in subsection (b).

(b) As used in this section, "member" refers to the following:

(1) A member of the Indiana National Guard.

(2) A member of a reserve component.

(3) A member of the retired personnel of the naval, air, or ground forces of the United States.

(c) A member is entitled to receive from the member's employer a leave of absence from the member's respective duties, in addition to regular vacation period, without loss of pay for such time as the member is:

(1) on training duties of the state of Indiana under the order of the governor as commander in chief; or

(2) a member of any reserve component under the order of the reserve component authority;

for consecutive or nonconsecutive periods not to exceed a total of fifteen (15) days in any calendar year.

(d) A member is entitled to receive from the member's employer a leave of absence from the member's respective duties, in addition to the member's regular vacation period, for the total number of days that the member is on state active duty under section 4 of this chapter.[4] This leave of absence may be

---

1. We heard oral argument in this case on October 22, 2001, in Indianapolis. We commend counsel for the quality of their appellate advocacy.

2. According to Employees, Richardson has continuously worked a "24/48" schedule, but Strode has "periodically ... been on a regular forty-hour day time [sic] work week." *Appellants' Brief* at 8.

3. We refer to both officers and employees as "employees" for simplicity's sake.

4. Ind.Code § 10–2–4–4 "authorize[s] and require[s]" the governor "in case of war, invasion, insurrection, public disaster, or breach of the peace or imminent danger thereof or any forcible obstructing of the execution of the laws or reasonable apprehension thereof, and at all other times he may deem necessary, to order on state duty the national guard or any part thereof."

with or without loss of time or pay at the discretion of the member's employer.[5]

As the trustee for Lawrence Township, Koppin oversees the LTFD. The Township's military leave policy reads in relevant part as follows: [6]

A. *DEFINITION*

1. Military leave is time off duty, with pay and without stand-in, for department employees who are also members of any of the Armed Forces Guard or Reserves for certain required trainings.

B. *RATIONALE*

1. Indiana Code Chapter 4, Section 10-2-4-1, 2 and 3 specifies that employers shall allow leave for the purpose of military assembly. The same code specifies the amount of time allotted.

C. *ALLOTMENT*

1. Each employee who is also a member of the National Guard or Reserves shall be allotted 15 work days per calendar year, without loss of pay or vacation leave, for

the specific purposes of military duty and training set forth in IC 10-2-4-3. For purposes of this section a "work day" is defined as an eight (8) hour period of regularly scheduled duty. Accordingly, Operations Personnel are entitled up to five (5) duty days of military leave per calendar year without loss of pay or vacation leave.

D. *REGULATIONS*

1. Military leave may be used only for the purposes of military duty and training.

2. Military leave is not cumulative, any leave not used in a calendar year does not carry over to the next year.

3. Leave not used up during the two-week training assembly may be used in the same calendar year for weekend drills, up to the yearly total of 15 working days. Additional time off required for weekend drills shall be obtained

**5.** This version of Ind.Code § 10-2-4-3 was approved and declared effective by the General Assembly on March 8, 1994. 1994 Ind. Acts 68. Subsection (c) of the statute was amended during the 2000 legislative session to provide that "[t]he entitlement to a leave of absence without loss of time or pay provided in this subsection is not at the discretion of the member's employer." 33 Ind. Acts 2000. The second sentence of subsection (d) was also amended to read as follows: "A leave of absence provided under this subsection may be with or without loss of time or pay at the discretion of the member's employer." *Id.* Throughout the record and in their appellate briefs, both parties cite to the 1992 version of the statute, which reads as follows:

All officers and employees of the state or any county, township, municipality, or school corporation of the state who are members of the Indiana national guard, reserve components or the retired personnel of the naval, air, or ground forces are entitled to leave of absence from their respective duties, in addition to regular vacation period, without loss of time or pay for such time as they are:

(1) on state active duty under section 4 of this chapter;

(2) on training duties of the state of Indiana under the order of the governor as commander in chief; or

(3) members of any reserve component under the order of the reserve component authority;

for consecutive or nonconsecutive periods not to exceed a total of fifteen (15) days in any calendar year.

**6.** The parties stipulated that the purposes of the Township's policy are to "1) comply with Indiana state law; 2) protect and economize the [LTFD's] use of its budgetary funds; and 3) protect the public safety by ensuring an adequate trained work force is present and available for duty at all times." *Appellants' Appendix* at 28.

through personal day leave or vacation leave or through obtaining stand-ins.

Thus, under the Township's policy, Employees were granted five twenty-four-hour "duty days" of paid military leave per year.

On December 22, 1998, Employees filed suit against Township in the United States District Court of the Southern District of Indiana under 42 U.S.C. § 1983, claiming that the Township's military leave policy violated their equal protection rights under the Fourteenth Amendment to the United States Constitution; they further claimed, *inter alia,* that the Township's policy violated the fifteen-day paid leave provision Ind.Code § 10-2-4-3.[7] On November 1, 1999, the district court granted Township's motion for summary judgment on Employees' equal protection claim but declined to exercise supplemental jurisdiction over their remaining state law claims.[8]

Employees filed suit against Township in Marion Superior Court on November 30, 1999. On May 12, 2000, the parties filed a pre-summary judgment statement of stipulated facts. The parties subsequently filed cross-motions for summary judgment seeking interpretation of Ind. Code § 10-2-4-3 as a matter of law. On December 27, 2000, the trial court granted Employees' motion on the issue of liability. The trial court's order reads in relevant part as follows:

### FINDINGS OF FACT

. . . .

17. The purpose of the Indiana Military Code [Ind.Code § 10-2-4-3] is to benefit our country's military preparedness by encouraging the enrollment of persons into the Guard and Reserve.

18. The Code was designed to enable employees of Indiana governmental units to serve in the Reserve and Guard without penalty, loss of income, or loss of benefits.

19. There is no authority given to local governmental units to define "day" as anything other than the plain meaning of day; that is, a twenty-four hour period.

20. Lawrence Township Fire Department requires the Plaintiffs to lose paid time and/or have to make special arrangements for coverage when they are on guard or reserve duty for fifteen days or less.

21. Both the plain meaning and the intent of Indiana Code Sec. 10-2-4-3 are not met by the Lawrence Township Fire Department. That is, the guard and reserve members of the Lawrence Township Fire Department who work a 24 hour on/48 hour off schedule are not allowed to serve in the guard and reserve for up to fifteen calendar days a year without penalty.

### CONCLUSIONS OF LAW

1. Rules of statutory construction require that the plain meaning of

---

7. Employees also claimed that Township "violated Ind.Code § 22-2-5-2 by failing to make timely payments of their wages" and "violated the Equal Privileges and Immunities Clause of the Indiana Constitution, Article I, Section 23." *Appellants' Appendix* at 64.

8. In its order, the district court noted that Strode and Richardson's state claims raised "novel issues of Indiana law," including "the

proper meaning of the word 'day' in Indiana's Military Leave statute [Ind.Code § 10-2-4-3]." *Appellants' Appendix* at 69. The district court further noted that while it "intimate[d] no opinion on the validity of [Townships'] interpretation of [Ind.Code § 10-2-4-3], there is no basis for finding the policy unreasonable, against established law, or otherwise afflicted." *Appellants' Appendix* at 67.

"day" be used in Indiana Code Sec. 10–2–4–3, which is a twenty-four hour period.

2. Lawrence Township does not have authority to use or define "day" in any manner that contravenes Indiana Code Sec. 10–2–4–3.

3. The statute is clear and unambiguous, Lawrence Township must permit their employees to fulfill their military duties without loss of either **time** or **pay**. The net effect of the Township's definition of the "work day" is to defeat the public policy of this state set forth in the statute. Regardless of Lawrence Township Fire Department's internal distinction between "work day" and day, the Defendants must allow each of its Reserve and Guard members up to fifteen calendar days off each year to meet their respective military commitments.

4. The Court finds that the Lawrence Township Fire Department and the Trustee violated Indiana Code 10–2–4–3, insofar as they have determined that the Plaintiffs are to be assessed three (3) works [*sic*] days during a twenty-four (24) hour work period for the purpose of computing the time due Plaintiffs under the statute. The result is Defendants['] untimely payment of wages due to the Plaintiffs.

*Appellants' Appendix* at 85–87. The trial court denied Township's motion to reconsider, and this interlocutory appeal ensued.

### DISCUSSION AND DECISION

▇▇ Summary judgment is appropriate only where the designated evidentiary material shows that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Spears v. Brennan*, 745 N.E.2d 862, 869 (Ind.Ct.App.2001); Ind. Trial Rule 56(C). "When reviewing an entry of summary judgment, we stand in the shoes of the trial court." *Id.* "The fact that the parties make cross-motions for summary judgment does not alter our standard of review. Instead, we must consider each motion separately to determine whether the moving party is entitled to judgment as a matter of law." *Lake States Ins. Co. v. Tech Tools, Inc.*, 743 N.E.2d 314, 318 (Ind.Ct.App.2001).

▇▇ Here, the trial court entered specific findings of fact and conclusions thereon, which are neither required nor prohibited in the summary judgment context. *See id.* "Although specific findings aid appellate review, they are not binding on this court." *Id.* "Because the construction of a statute is at issue and the relevant facts are not in dispute, the interpretation of the statute presents a pure question of law for which disposition by summary judgment is particularly appropriate." *ISTA v. Bd. of School Comm'rs of Indianapolis*, 693 N.E.2d 972, 974 (Ind.Ct.App. 1998). We review questions of law de novo and owe no deference to a trial court's legal conclusions. *See Spears*, 745 N.E.2d at 869.

▇▇ Where, as here, a statute has not been previously construed, "the express language of the statute and the rules of statutory construction apply." *ISTA*, 693 N.E.2d at 974. "If the language of a statute is clear and unambiguous, it is not subject to judicial interpretation. However, when the language is susceptible to more than one construction, we must construe the statute to determine the legislature's intent." *Spears*, 745 N.E.2d at 869 (citation omitted). "A statute is ambiguous when it is susceptible to more than one interpretation." *Elmer Buchta Trucking, Inc. v. Stanley*, 744 N.E.2d 939, 942 (Ind. 2001).

Township contends that "[a]n analysis of [Ind.Code § 10–2–4–3] and consideration of the policy ramifications that are inherent in construing 'day' as a twenty-four (24) hour day, as did the trial court, compels the conclusion that while the word 'day' is ambiguous, the most reasonable construction of the word 'day,' given its statutory context, is an eight (8) hour work day." *Appellants' Appendix* at 12–13. By contrast, Employees claim that "[w]ithout even consulting a dictionary, both the learned and unlearned will define and use the word 'day' as a twenty-four hour segment . . . as used in every calendar in our culture. Even small children know the plain meaning of the word 'day'." *Appellees' Brief* at 9–10.

 "When construing a statute, the legislature's definition of a word binds us. When the legislature has not defined a word, we give the word its common and ordinary meaning. In order to determine the plain and ordinary meaning of words, courts may properly consult English language dictionaries." *Indiana Office of Envtl. Adjudication v. Kunz,* 714 N.E.2d 1190, 1193 (Ind.Ct.App.1999) (citation omitted). "Day" may be defined as either "the mean solar day of 24 hours beginning at mean midnight" or "the time established by usage or law for work, school, or business." Merriam Webster's Collegiate Dictionary 294 (10th ed. 1994). Given these differing and equally plausible meanings, we must disagree with Employees' contention and the trial court's conclusion that the word "day" as used in Ind.Code § 10–2–4–3 is "clear and unambiguous."

 We must therefore "seek to ascertain and give effect to the legislature's intent." *Kunz,* 714 N.E.2d at 1193. We examine and interpret the statute as a whole and refrain "from overemphasizing a strict literal or selective reading of individual words." *Spears,* 745 N.E.2d at 869. Further, we are "compelled to ascertain and execute legislative intent in such a manner as to prevent absurdity and difficulty and prefer public convenience. In so doing, we are required to keep in mind the objects and purposes of the law as well as the effect and repercussions of such a construction." *Id.* at 869–70 (citation omitted); *see also Kunz,* 714 N.E.2d at 1193 ("[W]e presume that our legislature intended its language to be applied in a logical manner consistent with the statute's underlying policy and goals."). Once we determine the legislature's intent, we may then ascertain whether the Township's military leave policy comports with the statute.[9]

---

**9.** We do not agree with Township's assertion that "some deference is due to the interpretations of employers such as the [Township] that adopt reasonable interpretations of the term ["day"], because this interpretational latitude appears consistent with legislative intent." *Appellants' Brief* at 17. "It is hornbook law [that] municipal ordinances and regulations are inferior in status and subordinate to the laws and statutes of the state. When a state statute totally preempts the field, a city may not further legislate therein. If a city attempts to impose regulations in conflict with rights granted or reserved by the Legislature, such ordinances or regulations are invalid." *City of Indianapolis v. Fields,* 506 N.E.2d 1128, 1131 (Ind.Ct.App.1987).

Given that Ind.Code § 10–2–4–3 relates to the training of state militia and reserve units and grants certain rights to government employees who are members of such units, we may accord no deference to the Township's interpretation of the statute. *See Downing v. City of Columbus,* 505 N.E.2d 841, 844 (Ind.Ct. App.1987), *trans. denied* (" 'Clearly, more than municipal interests are involved in the establishment of a state militia, and the state statutes would control over municipal provisions. Likewise, the maintenance of a strong national defense involves more than purely local or municipal interest.' ") (quoting *Reed v. City of Tulsa,* 569 P.2d 451, 454 (Okla. 1977)); *see also* Ind. Const. art. XII, § 1 ("A militia shall be provided . . . . [and] may be

We noted in *Downing v. City of Columbus*, 505 N.E.2d at 844 that the purpose of Ind.Code § 10–2–4–3 was to provide state public employees with military leave rights comparable to those of federal public employees and to further state and federal policy encouraging participation in military duty. *Id.* Within that framework, we see no indication of legislative intent to treat differently some public employees. Rather, because the statute makes no distinctions between classes or types of public employees, we believe that the legislature intended to treat all public employees equally with regard to military service. Township's policy of paying for fifteen eight-hour days treats all public employees the same, in that it results in paying all public employees, regardless of the length of their shift, 120 hours of military leave. If we were to accept Employees' position, effectively each employee would be treated differently based on the type of shift he or she works. In this case, Employees would receive up to 360 hours of paid military leave, while a similarly situated firefighter working a more traditional forty hour, Monday through Friday work week would be paid for only 120. This cannot be the result that the legislature intended: to treat public employees differently based upon their unique work schedules. Furthermore, in adopting Ind. Code § 10–2–4–3, our General Assembly attempted to balance the desire to reduce the financial burden on those public employees who are members of the armed forces with the cost of doing so to the various governmental entities. Hence, it settled on fifteen days as an appropriate medium between these two important interests.

divided into active and inactive classes and consist of such military organizations as may

We note that in interpreting fifteen days as fifteen eight-hour days, Employees will have sufficient military leave to perform their two-week active duty commitment. Judge McKinney, in *Miller v. City of Indianapolis*, 2001 WL 406346 *6 (S.D.Ind. Apr.13, 2001), graphically demonstrated that in all cases of a 24/48 schedule, 120 hours of military leave is sufficient to provide for the two-week commitment. Admittedly, Employees also have weekend service commitments, some of which may overlap with on-duty hours with LTFD. However, this possibility is speculative and insufficient to upset the balance struck in the statute.

Courts in other jurisdictions have noted the inequity in Employees' position. For example, in *Kalb v. Village of Oak Lawn*, 128 Ill.App.3d 481, 83 Ill.Dec. 848, 470 N.E.2d 1268, 1269 (1984), the court interpreted a sick-leave ordinance authorizing payment of "accumulated unused sick leave of up to '120 days'." As here, the firefighter employees in *Kalb* customarily worked a 24/48 schedule and therefore argued that the word "day" in the ordinance referred to a twenty-four hour period, thus entitling them to be paid for up to 360 hours of unused sick leave. The court rejected such an argument, explaining:

> [Th]e word "days" in the ordinance should be given its common meaning with regard to an employee day, eight hours. Plaintiff in the instant case [a firefighter working a "24/48" schedule] performs 24 hours of work in a three day period, as does anyone working on a conventional eight-hour per day schedule. It would be contrary to the rules of statutory construction, and common sense, to compensate plaintiff for more

be provided by law.").

than eight hours for each of his 120 accumulated unused sick days. *Id.* at 1270. We find this reasoning persuasive, based on parity, common sense, and statutory construction.

Similarly, in *Airdo v. Village of Westchester,* 95 Ill.App.3d 568, 51 Ill.Dec. 58, 420 N.E.2d 472 (1981), the court interpreted a disciplinary decision calling for a firefighter's suspension for twenty-five "days." The firefighter worked a 24/48 schedule. The board of commissioners argued that the word day meant twenty-five duty days, or effectively seventy-five calendar days. The court held that the board's interpretation "fails to comply with principles of reasonableness and fairness." *Id.* at 473. The court noted that the board's interpretation would produce an inequitable result where the punishment given to two otherwise similarly situated employees would vary in relation to the work schedule of each, even though the suspensions were of equal length. Noting that the legislature could not have intended such an unjust, absurd, or unreasonable consequence, the court rejected the board's argument. *Id.* at 474.

Finally, in *Benson v. City of Little Falls,* 379 N.W.2d 711 (Minn.Ct.App.1986), another court noted the inequity of such a contention. In that case, a firefighter working a 24/48 schedule was entitled to severance pay of 100 working days, which he interpreted as 100 twenty-four hour days. The court commented that equity compelled finding the employee entitled to severance pay equal to 100 eight-hour days because "[a]cceptance of his interpretation would entitle him to triple the severance pay available to other city employees. Such as result would be unfair to those who receive severance pay based only on an eight-hour work day." *Id.* at 713. *See also Donaldson v. Taylor,* 327 Ark. 93, 936 S.W.2d 551 (1997) (holding that the City acted within its authority in redefining a sick day as an eight-hour day, so that a firefighter working a twenty-four-hour shift would be charged three sick days for missing an entire shift); *Hammock v. City of Auburn,* 676 So.2d 362 (Ala.Civ.App. 1996) (city's interpretation of leave accrual policy equating one day to one eight-hour day was reasonable. "In fact, any other interpretation may well be unreasonable from a managerial standpoint.").

Nonetheless, Employees direct us to *Howe v. City of St. Cloud,* 515 N.W.2d 77 (Minn.Ct.App.1994), where the court interpreted Minnesota's military leave statute, which is substantially similar to Ind.Code § 10–2–4–3. *Id.* at 79. The *Howe* court observed that "[b]ehind military leave statutes is the basic principle that a person who serves in the armed forces should not be penalized for that service in civilian life" and concluded,

St. Cloud schedules its firefighters to work 24–hour days. When the Howes miss a "day" due to military leave, they miss 24 hours of work. If the Howes are paid for less than 24 hours for each "day" missed due to military leave, they are penalized for their military service. To ensure that the Howes can take military leave without loss of pay as required by MINN.STAT. § 192.26, in this case they must be paid for 24 hours for every 24–hour day missed, up to 15 days per year.

*Id.* at 79–80.

Although the *Howe* court's reasoning is attractive, there was no evidence in that case that the city had ever defined day for its employees as anything other than a twenty-four hour period. Moreover, under this interpretation of Ind.Code § 10–2–4–3, an employee who works a twenty-four-hour shift would be entitled to receive compensation for more hours of paid military leave than an employee who works an

eight-hour shift. Additionally, state and local governments may be required to hire additional employees or pay overtime to current employees to cover the shifts of 24/48 employees while they are on military leave. Adopting this interpretation of a statute which applies equally to all on its face to ensure that Employees' military commitments are fully covered by military leave under every conceivable set of circumstances would elevate this interest over the interests of parity among all public employees and the interests of governmental entities in containing costs.

In summary, we conclude that the trial court erred in granting Employees' motion for summary judgment and that Township's military leave policy does not conflict with Ind.Code § 10–2–4–3 in defining "day."

Reversed.

BAILEY, J., concurs.

BROOK, C.J., dissents with separate opinion.

### BROOK, Chief Judge, dissenting

One of the canons of statutory interpretation is that "it is just as important to recognize what a statute does not say as it is to recognize what it does say." *Rush v. Elkhart County Plan Comm'n*, 698 N.E.2d 1211, 1215 (Ind.Ct.App.1998), *trans. denied.* Indiana Code Section 10–2–4–3 does not say that a state or local governmental entity may adopt its own interpretation of the word "day," and I agree with the majority on this point. I also agree with the majority that the legislature intended to treat all public employees equally with regard to military service. I must respectfully dissent, however, because section 10–2–4–3 does not say that this equality must be based on hours of military leave.

As noted by the majority, one of the many definitions of "day" is "the time established by usage or law for work, school, or business." MERRIAM WEBSTER'S COLLEGIATE DICTIONARY at 294.[10] While the customary workday for many government employees is indeed eight hours, the customary workday for firefighters like Strode and Richardson is twenty-four hours. Whether a government employee works an eight-hour shift or a twenty-four-hour shift, that employee must take a one-day leave of absence from his or her "respective duties" for each day of military training. To interpret "day" in this instance as anything other than the duration of an employee's customary workday would frustrate the legislature's objective of encouraging military service.[11]

I acknowledge that under this interpretation of section 10–2–4–3, an employee who works a twenty-four-hour shift would be entitled to and might in fact receive compensation for more hours of paid military leave than an employee who works an eight-hour shift.[12] Township claims that

**10.** I agree with the majority that the word "day" as used in section 10–2–4–3 is ambiguous and therefore subject to judicial interpretation.

**11.** In interpreting "day" as the duration of a government employee's customary workday, I am mindful of the variety and complexity of employee shifts and schedules that have arisen in the modern workplace. While I recognize that interpreting a "day" as an eight-hour period might simplify matters significantly and is superficially appealing on fair-

ness and fiscal grounds, I cannot conclude that such an interpretation is consistent with legislative intent.

**12.** In his amicus brief, Chief of the Indianapolis Fire Department Louis A. Dezelan ("Dezelan") contends that the trial court's "misinterpret[ation] of the term 'day' as used in Indiana Section 10–2–4–3[] could adversely impact the City of Indianapolis and other similarly situated fire departments." Both the record and Dezelan's brief are conspicuously silent, however, as to the number of

employees working a 24/48 schedule would thus receive "more pay" than "regular 'day' workers"; as Strode and Richardson correctly observe, however, firefighters and others working twenty-four-hour shifts would not receive a "windfall" for their military service but would only receive up to fifteen workdays of paid military leave, the same as "regular 'day' workers."[13] Under the majority's interpretation of section 10–2–4–3, however, a firefighter working a 24/48 schedule will receive a maximum of only five workdays of paid military leave.[14] Absent any indication to the contrary,[15] I cannot conclude that the General Assembly intended such an unfair result.

The majority cites to *Kalb*, 128 Ill. App.3d 481, 83 Ill.Dec. 848, 470 N.E.2d 1268, in pointing out the supposed inequity

firefighters who fall under the statute and the projected impact that such a "misinterpret[ation]" might have on budgetary and staffing considerations.

13. Should an employee working a 24/48 schedule exhaust his fifteen-day quota under my interpretation of section 10–2–4–3, he would be compensated for 360 hours of military leave per calendar year (15 days × 24 hours/day = 360 hours), whereas an employee working a five-day, forty-hour week would be compensated for 120 hours (15 days × 8 hours/day = 120 hours). Assuming, *arguendo*, that both employees earn a yearly salary of $30,000, the 24/48 employee would not earn a penny more than the forty-hour employee, but would instead be compensated for an additional 240 hours of military leave, i.e., 240 hours spent performing military duties rather than employment duties. I acknowledge that a forty-hour employee would be less likely to exhaust his fifteen-day quota during the course of a typical calendar year than a 24/48 employee, who must occasionally work weekends, and thus the discrepancy would typically be greater than 240 hours. The fact remains, however, that neither employee would earn more than $30,000 per year. I recognize that state and local governments might be required to hire additional employees or pay overtime to current employees to cover the shifts of 24/48 employees while they are on military leave, but the legislative intent expressed in section 10–2–4–3 is clear: government employees should not be penalized for their military service. The majority assumes that the General Assembly "settled on fifteen [eight-hour] days as an appropriate medium" in balancing the financial burdens of government employees and their respective employers with respect to military service; in my view, this assumption reads too much into the language of the statute and the legislative decisionmaking process. One could just as reasonably assume that the General Assembly carefully considered the potential economic impact of granting fifteen days of paid military leave to government employees regardless of their work schedules and consciously decided not to define "day" as an eight-hour period in order to encourage all government employees to serve in the military.

14. The majority states that under its interpretation of section 10–2–4–3, Strode and Richardson "will have sufficient military leave to perform their active duty commitment." While this may be true with respect to the annual two-week training commitment, their occasional weekend shifts will inevitably and repeatedly conflict with their monthly military training. On a 24/48 schedule, a firefighter must work an average of at least three weekend days per month (assuming, *arguendo*, a midnight-to-midnight shift), thereby ensuring that the firefighter will exceed the majority's quota of fifteen eight-hour "days" of paid military leave per calendar year.

15. In *Donaldson*, 327 Ark. 93, 936 S.W.2d 551, cited approvingly by the majority, the governing statute addressed accumulated sick leave in terms of "working days," which the court had previously construed "to mean an eight-hour day rather than a twenty-four hour shift" in calculating firemen's holidays. *Id.* at 552. Moreover, the *Donaldson* court observed that the "City of Pine Bluff has the authority to operate and manage its fire department, including its fire fighter's [*sic*] hours of duty, holiday compensation, annual vacation, and sick leave." *Id.* at 553. Given that section 10–2–4–3 does not contain the term "working days," and given the statewide defense interests and employment rights implicated therein, I do not find *Donaldson* persuasive.

in Strode and Richardson's position, but I remain unpersuaded by the *Kalb* court's emphasis on the fact that a firefighter working a 24/48 schedule "performs 24 hours of work in a three day period, as does anyone working on a conventional eight-hour per day schedule." *Id.* at 1270. While the *Kalb* court's rationale may initially seem appealing on fairness grounds, this tidy equivalence breaks down in less than one week and becomes even less tidy over the course of one month. On average, a firefighter on a 24/48 schedule works approximately 224 hours during a four-week period (9⅓ days × 24 hours/day = 224 hours), whereas an employee on a "conventional" weekday schedule works only 160 hours (20 days × 8 hours/day = 160 hours) during that same period. I am similarly unpersuaded by the majority's citation to *Airdo*, 95 Ill.App.3d 568, 51 Ill.Dec. 58, 420 N.E.2d 472, in which the court focused on the inequities of punishment based on varying work schedules; under the majority's interpretation of sec-

tion 10–2–4–3, Strode and Richardson and other similarly situated government employees will be unfairly penalized for their military service based on their work schedules. Finally, as for the majority's discussion of *Benson*, 379 N.W.2d 711, I would simply observe that I respectfully disagree as to where the legislature intended to draw the line of equity and fairness in granting government employees fifteen days of paid military leave.

Unlike the majority, I find the Minnesota Court of Appeals' decision in *Howe*, 515 N.W.2d 77, both instructive and persuasive. I agree with the *Howe* court that the "basic principle" underlying military leave statutes is "that a person who serves in the armed forces should not be penalized for that service in civilian life." *Id.* at 79.[16] More importantly, I believe that the General Assembly's intent not to penalize government employees for their military service is expressed in even more definitive terms than was the Minnesota legislature's in *Howe*.[17]

**16.** *See also* 38 U.S.C. § 4301(a) (first subchapter of 1994 United States Employment and Reemployment Rights of Members of the Uniformed Services Act ("USERRA"); stating that purposes of USERRA are "(1) to encourage noncareer service in the uniformed services by eliminating or minimizing the disadvantages to civilian careers and employment which can result from such service; (2) to minimize the disruption to the lives of persons performing service in the uniformed services as well as to their employers, their fellow employees, and their communities, by providing for the prompt reemployment of such persons upon their completion of such service; and (3) to prohibit discrimination against persons because of their service in the uniformed services."); *see also id.* § 4311(a) ("A person who is a member of, applies to be a member of, performs, has performed, applies to perform, or has an obligation to perform service in a uniformed service shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership, application for

membership, performance of service, application for service, or obligation.").

**17.** The majority correctly observes that there was "no evidence that the city [of St. Cloud] had defined 'day' for the Howes as anything other than a 24–hour period," *Howe*, 515 N.W.2d at 80, but the *Howe* court simply mentioned this fact in responding to the city's argument that it had "the inherent managerial authority to define 'day' as less than 24 hours for the firefighters." *Id.* The *Howe* court did not base its interpretation of the applicable statute on the city's historical definition of the term "day"; in fact, the court invalidated the military leave term in the city's collective bargaining agreement with the firefighters because it directly conflicted with the court's interpretation of the statute. *See id.; see also Boelter v. City of Coon Rapids*, 67 F.Supp.2d 1040, 1043–46 (D.Minn.1999) (addressing firefighters' action to enjoin enforcement of city's military leave policy requiring them to "proceed directly from their military post to the fire department to be entitled to pay for their military leave"; ac-

Under section 10–2–4–3, a government-employed member of the aforementioned military organizations is entitled to "a leave of absence *from the member's respective duties,* in addition to regular vacation period, without loss of time or pay" while the member is "on training duties" or "a member of any reserve component ... for consecutive or nonconsecutive periods not to exceed a total of fifteen (15) days in any calendar year." (Emphasis added.) In Strode and Richardson's case, taking a leave of absence from their respective duties for military training entails missing a twenty-four-hour workday, and thus they should be paid for every twenty-four-hour workday they miss while on military leave, up to a total of fifteen days per calendar year. I would therefore affirm the trial court's grant of summary judgment.

knowledging that city, like City of St. Cloud in *Howe,* had defined "day" as 24–hour day, but relying on "plain reading" of Minn.Stat. § 192.26 in concluding that "firefighters serving in the military may take their entire 24–hour work shift as military leave without loss of pay for a period of up to 15 days").